**BRAD'S MACHINE PRODUCTS, INC.,**
**Plaintiff-Appellee,**

v.

**PHOENIX ASSURANCE COMPANY OF NEW YORK, Defendant-Appellant.**

**No. 73-1582.**

United States Court of Appeals, Fifth Circuit.

Feb. 19, 1974.

Charles A. Stewart, Jr., Thomas B. Huie, Birmingham, Ala., for defendant-appellant.

Macbeth Wagnon, Jr., Lee C. Bradley, Jr., Birmingham, Ala., for plaintiff-appellee.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiff-appellee, Brad's Machine Products, Inc., brought this suit against the defendant-appellant, Phoenix Assurance Co., to recover on a fidelity bond for losses occasioned by the defalcations of one of Brad's employees. The jury returned a verdict for the plaintiff in the amount of $138,000. On appeal, Phoenix argues that the evidence was insufficient to support a finding that Brad's notified Phoenix within a reasonable time after the discovery of the loss, as required by the policy, and that

Brad's therefore forfeited any right to recover under the policy. We affirm.

Brad's was an Alabama company engaged in the manufacture of M–125 fuses under government defense contracts. The losses involved here were occasioned when Maurice Dailey, vice president of the company, received cash payments for open market sales of brass scrap to Culp Iron & Metal Co., Brad's major open market customer for brass scrap. Dailey made the sales over a fifteen-month period from October 1967 to January 1969.

The chronology of events leading to Brad's discovery of Dailey's defalcations was as follows. In January 1969, Giles Roy Compton, comptroller for Brad's began to suspect that Dailey had been receiving cash for the sales of brass scrap to Culp. According to his own testimony, Compton's suspicion at this time was not that Dailey was appropriating the cash for his own personal use, but only that Dailey was taking cash for the sales and violating the company's established accounting procedures. At the time Compton asked Henry Culp, Jr., of Culp Iron & Metal, to give him a list of the cash payments made to Compton. Shortly thereafter, Compton went to Dailey and confronted him with the charge that Dailey had been violating company procedures by receiving cash for the brass scrap sales; Dailey admitted to having received over $100,000 in cash payments, and agreed that in the future he would abide by company procedures. Dailey resigned as vice president in mid-March 1969.

After receiving the list of payments from Culp, Compton checked Brad's bank accounts and books to determine whether cash deposits corresponding to the payments on the list could be found. He testified that he had had difficulty identifying any corresponding deposits. In April 1969, Brad's hired certified public accountants from Arthur Andersen & Co. to prepare corporate tax returns and financial statements and to do a general audit of the company. During this audit, the accountants too had diffi-

culty locating cash deposits corresponding to the payments received by Dailey. In June 1969, the accountant in charge of the audit, with Compton's help, procured from Culp the record of the payments made to Dailey, and was allowed to see Culp's accounts payable ledger. The accountant then checked Brad's records, and found that none of the transactions were recorded in Brad's accounts; again he had difficulty locating deposits corresponding to the cash transactions. The accountant reported his difficulties to a meeting of Brad's officers and directors on July 22, 1969. He told the meeting that he could not find entries in Brad's books accounting for the amounts received by Dailey, and said that he needed to make a further investigation to determine what had become of the money.

At that time, John C. Bradford, Chairman of the Board and sole stockholder in Brad's, instructed the Arthur Andersen accountants to proceed with the investigation. Shortly after the meeting, however, these instructions were countermanded by Brad's attorneys in Los Angeles, who were representing Bradford and Brad's in connection with an IRS audit of Bradford's personal and Brad's corporate income tax returns for 1968, and who wanted all relevant records sent to California. The papers were not returned to the Arthur Andersen accountants until April 1970. At that time, they resumed their investigation of the payments made to Dailey. By June 1970, the Arthur Andersen accountants had advanced with their analysis of Brad's books to the point where it appeared clear that Dailey had misappropriated substantially all of the cash he had received from Culp, with the exception of amounts delivered on five different dates totalling $60,500. These amounts were deposited in Brad's accounts and could be traced, by inference, to the payments from Culp. On June 9, 1970, Brad's notified Phoenix of the loss from Dailey's defalcations. On November 9, 1970, Brad's filed proof of loss.

The fidelity bond between Brad's and Phoenix provides:

This bond is executed and accepted subject to the agreements, limitations and conditions set forth herein, which conditions shall be conditions precedent to recovery under this bond . . . .

8. Notice of Loss and Filing of Claim: Upon discovery by the insured of any dishonest act on the part of any employee the insured shall, within a reasonable time after such discovery, give written notice thereof addressed to the company . . . .

. . . Affirmative proof of loss . . . shall be filed with the company at its home office within three months after such discovery.

■ Phoenix's argument in this Court has two prongs. Phoenix argues first that the evidence at trial was not sufficient to support a jury finding that the notice given by Brad's in June 1970 satisfied the contractual condition of notice to the insurer "within a reasonable time after . . . discovery [by the insured of any dishonest act on the part of any employee]". Second, it argues that a failure to provide notice within a "reasonable time" defeats any rights Brad's may have had under the bond.

Phoenix's argument that the evidence was insufficient to support the judgment is premised on the assumption that Brad's "discovered" Dailey's "dishonest act", within the meaning of the policy, either in February 1969, at the time of Compton's confrontation with Dailey, or in July 1969, at the time of the accountant's report to the officers. Phoenix thus assumes that the delay in giving notice was either 11 or 16 months, and argues that either constitutes an unreasonable delay. We cannot, however, accept the assumption that the jury was bound to conclude that Brad's had "discovered" a "dishonest act" either in February or in July 1969. In February, the evidence establishes only that Compton knew that Dailey had been following an improper accounting procedure, not that he had been misappropriating funds or that he had been dishonest in any other way. In July, the evidence estab-

lished that the accountants could not be sure even that the cash payments made by Culp had been lost, let alone that they had been lost through dishonesty on Dailey's part. It is significant that only later did the accountants verify that $60,500 worth of cash payments in fact had not been diverted.

 Phoenix makes several arguments in support of its view that discovery occurred in July 1969. We find all of them unpersuasive. Phoenix argues that the notice requirement attaches when the *loss* is discovered, and does not await ascertainment of the *extent* of the loss. In fact, what the terms of the policy require is discovery of a *dishonest act*; but in any event, the accountants were not prepared in July 1969 to assure Brad's even that a loss had occurred. Phoenix urges that the notice given was untimely because Brad's was not sufficiently diligent in pursuing its investigation into the possibility of its employee's dishonesty. We are unable, however, to read the bond as creating a duty of diligence on the insured's part in discovering an employee's dishonesty; even were we prepared so to read the bond, moreover, it is not clear that we could hold that Brad's had breached any such duty of diligence. See FDIC v. Aetna Cas. & Ins. Co., 5 Cir. 1970, 426 F.2d 729; National Surety Co. v. Alabama Farm Bureau Cotton Ass'n, 5 Cir. 1934, 68 F.2d 816. Phoenix also argues that Brad's learned no specific new piece of information after July 1969, and suggests that this implies it had full knowledge of Dailey's dishonesty in July 1969. The suggestion is without merit, since it was only after July 1969 that Brad's learned for a *fact* that the money Daily had received had not in any form been turned over to Brad's.

Since we conclude there was evidence to support a jury finding that Brad's did not discover the dishonesty of Dailey until June 1970, there is no reason for us to inquire into the merits of the second prong of the appellant's argument.

Affirmed.